T.C. Memo. 2004-154


UNITED STATES TAX COURT


KAMIL F. AND NAGWA GOWNI, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

GEORGE R. AND NEHAD MANSOUR, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 8094-02, 8095-02.    Filed June 29, 2004.


Peter C. Pappas, for petitioners.

Stephen R. Takeuchi, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge:  Respondent determined deficiencies, an addition to tax, and penalties with respect to petitioners Kamil F. and Nagwa Gowni's (the Gownis) Federal income taxes for 1998 and 1999 as follows:

|      |            | Addition to Tax   | Penalty      |
| Year | Deficiency | Sec. 6651(a)(1)   | Sec. 6662(a) |
|------|------------|-------------------|--------------|
| 1998 | $105,470   | --                | $21,094      |
| 1999 | 114,603    | $27,087.75        | 22,921       |

Respondent determined deficiencies, an addition to tax, and penalties with respect to petitioners George R. and Nehad Mansour's (the Mansours) Federal income taxes for 1996, 1997, 1998, and 1999 as follows:

|      |            | Addition to Tax   | Penalty      |
| Year | Deficiency | Sec. 6651(a)(1)   | Sec. 6662(a) |
|------|------------|-------------------|--------------|
| 1996 | $93,552    | $23,494.20        | $18,710.40   |
| 1997 | 18,093     | --                | 3,618.60     |
| 1998 | 129,324    | --                | 25,864.80    |
| 1999 | 42,884     | --                | 8,576.80     |

The issues for decision in these consolidated cases are: (1) Whether one of petitioners' S corporations recognized a gain rather than a loss on the sale of its assets; (2) whether petitioners have shown that respondent's computation of their income for the years in issue using the bank deposits method is inaccurate or that any of the deposits that were made into their personal bank accounts during the years in issue are not taxable; (3) whether petitioners are liable for additions to tax under section 6651(a)(1); and (4) whether petitioners are liable for accuracy-related penalties under section 6662(a).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and

Procedure.  Except for the amounts shown above, all amounts have been rounded to the nearest dollar.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.  At the time that the Gownis filed their petition at docket No. 8094-02, they resided in Florida.  At the time that the Mansours filed their petition at docket No. 8095-02, they also resided in Florida.

Background

Petitioner George R. Mansour (Mr. Mansour) is 45 years old and was born in Egypt.  After graduating from high school in Egypt, Mr. Mansour attended college in Egypt and studied chemistry for 2 years and accounting for another 2 years.  In 1981, Mr. Mansour immigrated to the United States and has been a U.S. resident since that time.  Mr. Mansour lived in Ohio for a portion of 1981 before he moved to California.  While in California, Mr. Mansour attended college and worked at a gasoline station.  In 1986, Mr. Mansour moved to Florida.  From 1986 until sometime in 1987 or 1988, Mr. Mansour worked in a convenience store as a cashier/clerk and then as an assistant manager for Southland Corp.  Mr. Mansour married petitioner Nehad Mansour (Mrs. Mansour) in 1987.  Mrs. Mansour came to the United States

in 1991.  During 1996, 1997, 1998, and 1999, Mrs. Mansour was a homemaker.  Mr. Mansour has a real estate license.

Petitioner Kamil F. Gowni (Mr. Gowni) is 45 years old and was born in Egypt.  After graduating from high school in Egypt, Mr. Gowni attended college and studied agriculture for 3 years. Mr. Gowni immigrated to London, England, in 1978.  During the time that Mr. Gowni lived in England, he studied and worked as an assistant manager in a restaurant.  Mr. Gowni immigrated to the United States in 1982 and has been a U.S. resident since that time.  From 1982 to 1993, Mr. Gowni lived in Los Angeles, California.  While in Los Angeles, Mr. Gowni managed a gasoline station and worked with computers for Teledyne Corp.  Mr. Gowni married petitioner Nagwa Gowni (Mrs. Gowni) in 1988.  The Gownis moved to Florida in 1993.  From December 31, 1997, through November 4, 1998, the Gownis bought and sold stocks totaling approximately $1.7 million.  During 1998 and 1999, Mrs. Gowni was a homemaker.

Messrs. Gowni and Mansour met in Los Angeles in 1984 or 1985 while attending the same church.

Petitioners' Business Entities

Petitioners used a number of different corporations to conduct their business affairs during the years in issue. Messrs. Gowni and Mansour were actively and substantially involved in the operation of these business entities.

Messrs. Gowni and Mansour commingled the funds of these corporations and generally treated the corporations' bank accounts as one account.

A. Mansour Enterprises, Inc.

In March 1989, Mr. Mansour and his brother, Sam Mansour, organized Mansour Enterprises, Inc. (Mansour Enterprises), as a Florida corporation. Mansour Enterprises purchased a gasoline station located in Mt. Dora, Florida, and operated it as an Amoco gasoline station until sometime in 1998. The gasoline station included a snack shop and a repair facility with an automobile mechanic on the premises. Mansour Enterprises filed a corporate income tax return for 1996 and reported $53,400 of ordinary income from its operations for that year.

B. Mansour's of Mount Dora, Inc.

In November 1989, Mr. Mansour and his brother organized Mansour's of Mount Dora, Inc. (Mansour's of Mt. Dora), as a Florida corporation. Mansour's of Mt. Dora owned the building next to the gasoline station owned by Mansour Enterprises and leased it to a car detail shop and a hair salon during 1996, 1997, 1998, and 1999. This building was also used for storage.

C. Pyramid of Lake County, Inc.

In October 1992, Pyramid of Lake County, Inc. (Pyramid), was organized as a Florida corporation. Messrs. Gowni and Mansour owned and operated Pyramid. Pyramid owned a gasoline station in

Eustis, Florida, that it leased to a third party. Pyramid sold the gasoline station in 1999 or 2000.

D. Mina of Deland, Inc.

In November 1992, Mina of Deland, Inc. (Mina of Deland), was organized as a Florida corporation. Messrs. Gowni and Mansour owned and operated Mina of Deland. Mina of Deland leased a gasoline station from the Amoco Oil Co. (Amoco). The lease terminated sometime between 1994 and 1996.

E. Mina of Sanford, Inc.

In October 1993, Mina of Sanford, Inc. (Mina of Sanford), was organized as a Florida corporation. Messrs. Gowni and Mansour owned and operated Mina of Sanford. Mina of Sanford owned and operated a gasoline station in Sanford, Florida, from 1993 through 1999.

F. Mina of Forest City, Inc.

In July 1994, Mina of Forest City, Inc. (Mina of Forest City), was organized as a Florida corporation. Messrs. Gowni and Mansour owned and operated Mina of Forest City. Mina of Forest City owned and operated an Amoco gasoline station in Orlando, Florida, from 1994 until it transferred its assets to Bishoy, Inc., in 1998. The following explanation was given for the asset transfer on an attachment to the Form 1120S, U.S. Income Tax Return for an S Corporation, that was filed for Mina of Forest City for 1998:

Spin-Off

Taxpayers elect under IRC sec 355 to spin off 100% of basis and surrender of stock in exchange for stock and basis in spin-off company, Bishoy, Inc. * * * Business purpose of change in oil company supplier required this transaction!

Mina of Forest City filed Forms 1120S for 1996, 1997, and 1998 and reported $30,908 and $48,405 of ordinary income from its operations in 1996 and 1997, respectively, and a loss of $1,512 in 1998. The Form 1120S filed for Mina of Forest City for 1998 was its final return. On the Schedule M-2, Analysis of Accumulated Adjustments Account, Other Adjustments Account, and Shareholders' Undistributed Taxable Income Previously Taxed, attached to its Form 1120S filed for 1998, Mina of Forest City's accumulated adjustments account was reported to have a balance of $64,681 as of the end of that year. John L. Bradshaw, P.A., C.P.A. (Bradshaw), prepared these Forms 1120S for Mina of Forest City.

In a letter dated November 10, 1999, and addressed to Bradshaw, the Internal Revenue Service (IRS) granted Mina of Forest City S corporation status with an effective date of January 1, 1995.

G. Micca, Inc.

In April 1995, Micca, Inc. (Micca), was organized as a Florida corporation. Messrs. Gowni and Mansour owned and operated Micca. Micca operated as a C corporation during the

years in issue. Micca purchased real property and, with financing provided by Amoco, built a gasoline station and convenience store on that property. Micca operated the gasoline station from 1996 until sometime in 1998. Micca filed a corporate income tax return for 1996 and reported taxable income of $52,923 for that year.

H. Tomson, Inc.

In August 1995, Tomson, Inc. (Tomson), was organized as a Florida corporation. Messrs. Gowni and Mansour owned and operated Tomson. In 1995, Tomson negotiated the purchase from Amoco of an existing Amoco gasoline station that was located in Orlando. The purchase price of the gasoline station was $330,000. Tomson was to pay Amoco $140,000 at closing. Tomson borrowed $140,000 from Citicorp North America, Inc., in order to make this payment. The remaining $190,000 of the purchase price was secured by a note owed to Amoco. The note was payable over 10 years and was reduced by 1 cent for every gallon of motor fuel that Tomson purchased from Amoco. The closing date for the sale was January 22, 1996.

Tomson contracted with Orange Petroleum, Inc. (Orange Petroleum), for the installation of gasoline tanks and related work. Tomson paid Orange Petroleum $159,462 for this work, which was completed by April 22, 1996.

Tomson contracted with Joseph P. Sexton, Inc. (Sexton), to renovate the existing building and surrounding property. The gasoline station had service bays to repair automobiles. Sexton converted the space for the service bays into a convenience store. Tomson paid Sexton $183,507 for this work, which was completed by the end of June 1996. The gasoline station was ready for business at that time.

Tomson operated the gasoline station and convenience store until it sold the property to Sembler E.D.P. Partnership (Sembler) in 1998 for $822,000. The closing date for the sale was April 9, 1998. As of the closing date, the $190,000 note that was payable to Amoco had been reduced to $170,000. Tomson did not pay the balance of the note.

Petitioners determined the basis that Tomson had in the property that it sold to Sembler by taking into account the following amounts:

| Source | Amount |
|---|---|
| Purchase of property from Amoco | |
| - Cash | $140,000 |
| - Note | 190,000 |
| Tank installation costs | 159,462 |
| Construction costs | |
| - Ryko Manufacturing | 45,005 |
| - Sexton | 145,000 |
| Sale closing/miscellaneous expenses | 64,229 |
| Additional expenses | 168,304 |

Accordingly, petitioners determined that Tomson had a $912,000 basis in the property that it sold to Sembler and that the sale generated a $90,000 capital loss.

I.  Shenody, Inc.

In December 1995, Shenody, Inc. (Shenody), was organized as a Florida corporation.  Messrs. Gowni and Mansour owned and operated Shenody.  Shenody leased an Amoco gasoline station during 1996, 1997, 1998, and 1999.

J.  Bishoy, Inc.

In July 1996, Bishoy, Inc. (Bishoy), was organized as a Florida corporation.  Messrs. Gowni and Mansour owned and operated Bishoy.  From the time that Mina of Forest City transferred the Amoco gasoline station to Bishoy in 1998, Bishoy operated the station as a Hess gasoline station.  Bishoy operated the gasoline station through 1999.

Bishoy filed Forms 1120S for 1998 and 1999 and reported ordinary income of $18,580 and $5,295, respectively, from its operations in those years.  On the Schedule M-2 attached to its Form 1120S filed for 1998, Bishoy's accumulated adjustments account was reported to have a balance of $18,580 as of the end of that year.  Bradshaw prepared these Forms 1120S for Bishoy.

K.  Ava Anthony, Inc.

In September 1996, Ava Anthony, Inc. (Ava Anthony), was organized as a Florida corporation.  Messrs. Gowni and Mansour

owned and operated Ava Anthony.  Ava Anthony operated as a C corporation during the years in issue.  In 1996, Ava Anthony owned land.  In 1998, Ava Anthony purchased 10 gasoline stations from Presto Food Stores for approximately $9 million and operated them through 1999.

Bradshaw's Employment by Petitioners

Beginning in May 1998, petitioners employed Bradshaw to do the accounting for Mina of Sanford, Mina of Forest City, and Shenody.  This arrangement eventually expanded to include Ava Anthony and Bishoy.  Bradshaw did not do the accounting for petitioners' other business entities and had not done any other work for petitioners prior to May 1998.

From the time that he began working for petitioners, Bradshaw was aware that petitioners withdrew cash from the corporate bank accounts of Ava Anthony, Mina of Sanford, Mina of Forest City, Bishoy, and Shenody before he could reconcile those accounts.  Bradshaw was also aware that petitioners frequently wrote checks from the corporate bank accounts of their business entities and deposited them into their personal bank accounts. Bradshaw advised petitioners to discontinue this latter practice.

The Mansours' Income Tax Returns for 1996 through 1999

On their joint income tax return for 1996, the Mansours reported the following sources of income:

| Source | Amount of Income |
|--------|------------------|
| Wages | $9,300 |
| Taxable interest | 1,545 |
| Dividends | 1,000 |
| Capital gains | 245 |
| Rental property | 4,504 |
| Mansour Enterprises | 9,044 |
| Mina of Forest City | 10,454 |
| Mina of Deland | 2,064 |
| Mina of Sanford | 10,524 |
| Shenody | 5,133 |
| Bishoy | 6,575 |

The Mansours reported taxable income of $27,204 and total tax of $4,084 for 1996. The Mansours identified Mansour Enterprises, Mina of Forest City, Mina of Deland, and Mina of Sanford as S corporations on this return. The IRS received the Mansours' 1996 return on September 28, 1998, in an envelope that was postmarked September 25, 1998. Tax Aid & Accounting, Inc., prepared the Mansours' 1996 return.

On their joint income tax return for 1997, the Mansours reported the following sources of income:

| Source | Amount of Income |
|--------|------------------|
| Taxable interest | $98 |
| Dividends | 68 |
| Capital gains | 2,343 |
| Gambling winnings | 2,500 |
| Rental properties | 5,650 |
| Mansour Enterprises | 12,000 |
| Mina of Forest City | 24,202 |
| Mina of Sanford | 42,053 |
| Mansour's of Mt. Dora | 8,000 |

The Mansours reported taxable income of $52,130 and total tax of $9,239 for 1997. The Mansours identified Mansour Enterprises,

Mina of Forest City, Mina of Sanford, and Mansour's of Mt. Dora as S corporations on this return. Bradshaw prepared the Mansours' 1997 return.

On their joint income tax return for 1998, the Mansours reported the following sources of income and loss:

| Source | Amount of Income (Loss) |
|---|---|
| Wages | $19,200 |
| Taxable interest | 78 |
| Dividends | 23 |
| Tomson | (45,000) |
| Short-term capital gains | 1,994 |
| Sales of business property | 36,557 |
| Capital gain distributions | 19 |
| Rental properties | (2,465) |
| Mansour Enterprises | 13,000 |
| Mina of Forest City | (756) |
| Mina of Sanford | 39,144 |
| Mansour's of Mt. Dora | 6,300 |
| Shenody | (3,679) |
| Bishoy | 9,290 |

The Mansours reported taxable income of $29,588 and total tax of $3,636 for 1998. The $45,000 loss reported by the Mansours with respect to Tomson represented one-half of the long-term capital loss that was calculated from Tomson's sale of its gasoline station to Sembler in 1998. The Mansours identified Mansour Enterprises, Mina of Forest City, Mina of Sanford, Mansour's of Mt. Dora, Shenody, and Bishoy as S corporations on this return. Bradshaw prepared the Mansours' 1998 return.

On their joint income tax return for 1999, the Mansours reported the following sources of income and loss:

| Source | Amount of Income (Loss) |
|---|---|
| Wages | $39,475 |
| Taxable interest | 35 |
| Dividends | 51 |
| Short-term capital losses | (2,028) |
| Long-term capital loss carryover | (3,430) |
| Capital gain distributions | 259 |
| Mansour Enterprises | 5,700 |
| Mina of Sanford | (10,023) |
| Mansour's of Mt. Dora | 12,150 |
| Shenody | (6,325) |
| Bishoy | 2,647 |

The Mansours reported taxable income of $2,160 and total tax of zero for 1999.  The Mansours identified Mansour Enterprises, Mina of Sanford, Mansour's of Mt. Dora, Shenody, and Bishoy as S corporations on this return.  Bradshaw prepared the Mansours' 1999 return.

The Gownis' Income Tax Returns for 1998 and 1999

On their joint income tax return for 1998, the Gownis reported the following sources of income and loss:

| Source | Amount of Income (Loss) |
|---|---|
| Wages | $15,000 |
| Taxable interest | 8,505 |
| Tomson | (45,000) |
| Mina of Forest City | (756) |
| Mina of Sanford | 39,144 |
| Shenody | (3,680) |
| Bishoy | 9,290 |

The Gownis reported taxable income of $30,984 and total tax of $3,846 for 1998.  The $45,000 loss reported by the Gownis with respect to Tomson represented one-half of the long-term capital loss that was calculated from Tomson's sale of its gasoline

station to Sembler in 1998.  The Gownis were limited to recognizing $3,000 of this loss in 1998.  The Gownis identified Mina of Forest City, Mina of Sanford, Shenody, and Bishoy as S corporations on this return.  Bradshaw prepared the Gownis' 1998 return.

On their joint income tax return for 1999, the Gownis reported the following sources of income and loss:

| Source | Amount of Income (Loss) |
|---|---|
| Wages | $39,475 |
| Taxable interest | 827 |
| Long-term capital loss carryover | (42,000) |
| Mina of Sanford | (10,023) |
| Shenody | (6,325) |
| Bishoy | 2,647 |

The Gownis reported taxable income of zero for 1999.  The Gownis were limited to recognizing $3,000 of their reported $42,000 long-term capital loss carryover in 1999.  The Gownis identified Mina of Sanford, Shenody, and Bishoy as S corporations on this return.  Bradshaw prepared the Gownis' 1999 return.

The Gownis requested an extension to file their 1999 return. Their first request extended the time to file to August 15, 2000. Their second request extended the time to file to October 15, 2000.  On Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax Return, the Gownis estimated that their total tax liability for 1999 was zero.  The Gownis' 1999 return was received by the IRS on November 6, 2000, in an envelope with a postage meter date of November 3, 2000.

Examination of the Mansours' Income Tax Returns for
1996 through 1999

The examination of the Mansours' income tax return for 1996 began in June 1999 and expanded to include 1997, 1998, and 1999. The Mansours executed a power of attorney in favor of Bradshaw with respect to their income tax returns for 1996, 1997, and 1998. During the examination of the Mansours' income tax returns, the IRS made requests for copies of workpapers, the income tax returns of their business entities, and bank statements. The Mansours did not produce adequate records with respect to those requests, however, so the IRS summonsed the Mansours' bank records in order to make an appropriate determination of their income for those years.

In determining the Mansours' income for 1996, the IRS summonsed and evaluated copies of the bank statements from, the checks written for $500 or more on, and any items that were listed on deposit tickets totaling $500 or more that were deposited to the Mansours' personal bank account at First Union National Bank of Florida (First Union) for that year. In determining the Mansours' income for 1997, the IRS summonsed and evaluated copies of the bank statements from, checks written for $500 or more on, and any items that were listed on deposit tickets totaling $500 or more that were deposited to the Mansours' personal bank account at First Union as well as the bank statements from, checks written for $1,000 or more on, and

any items that were listed on deposit tickets totaling $300 or more that were deposited to the Mansours' personal bank account at SunTrust Bank (SunTrust) for that year.  In determining the Mansours' income for 1998 and 1999, the IRS summonsed and evaluated copies of the bank statements from, checks written for $1,000 or more on, and any items that were listed on deposit tickets totaling $300 or more that were deposited to the Mansours' personal bank account at SunTrust for those years.  During the examination of the Mansours' bank records, the IRS requested that the Mansours provide documentation and explanations as to any nontaxable items that were deposited to their personal bank accounts.  The IRS received information about Mina of Sanford's shareholder loan account in response to those requests.

The examination of the Mansours' income tax returns for 1996 through 1999 and the evaluation and analysis of their bank records and other information spanned 2 years and consumed more than 300 hours of revenue agent time.

Results of the Examination of the Mansours' Income Tax Returns

A.  1996

The IRS made the following determinations with respect to the Mansours for 1996:

1. Unreported Income From the Operations of Mansour Enterprises

The corporate income tax return for Mansour Enterprises for 1996 reported ordinary income of $53,400 from its operations during that year.  The IRS determined that Mansour Enterprises was an S corporation during 1996 and that the Mansours' distributable share of this income was $26,700.  The Mansours reported income from the operations of Mansour Enterprises in the amount of $9,044 on their 1996 return.  Accordingly, the IRS determined that the Mansours should have included an additional $17,656 in income.

2. Corporate Distributions

The Mansours received and deposited into their personal bank account at First Union checks from Micca, net of repayments, totaling $52,000.  The IRS determined that the Mansours should have reported this amount as dividend income.

The Mansours received and deposited into their personal bank account at First Union checks from Mina of Forest City, net of repayments, totaling $24,484.  The IRS determined that Mina of Forest City was an S corporation during 1996 and that the Mansours had failed to establish their basis in their Mina of Forest City stock.  Accordingly, because the Mansours reported income of $10,454 from the operations of Mina of Forest City on their 1996 return, the IRS determined that the Mansours should

have included an additional $14,030 in income as a result of these distributions.

The Mansours received and deposited into their personal bank account at First Union checks from Mina of Sanford, net of repayments, totaling $31,750. The IRS determined that Mina of Sanford was an S corporation during 1996 and that the Mansours had failed to establish their basis in their Mina of Sanford stock. Accordingly, because the Mansours reported income of $10,524 from the operations of Mina of Sanford on their 1996 return, the IRS determined that the Mansours should have included an additional $21,226 in income as a result of these distributions.

### 3. Other Income

The Mansours received and deposited into their personal bank account at First Union unexplained amounts of cash and checks from sources other than their business entities or those reported on their income tax return totaling $138,235. The IRS determined that the Mansours should have reported this amount on their 1996 return as income from self-employment.

### B. 1997

The IRS determined that the Mansours received and deposited into their personal bank accounts at First Union and SunTrust unexplained amounts of cash and checks from sources other than their business entities or those reported on their income tax

return totaling $44,818.  The IRS determined that the Mansours should have reported this amount on their 1997 return as income from self-employment.

C.  <u>1998</u>

The IRS made the following determinations with respect to the Mansours for 1998:

1.  <u>Distributable Gain From the Sale of Property by Tomson</u>

Tomson had a $413,696 basis in the property that it sold to Sembler and recognized a $408,304 gain on the sale.  The IRS determined that Tomson was an S corporation during 1998 and that $204,152 of this gain was attributable to the Mansours.  Because the Mansours reported a $45,000 loss from this sale on their 1998 return, the IRS adjusted the Mansours' income to reflect this gain.

2.  <u>Corporate Distributions</u>

The Mansours received and deposited into their personal bank account at SunTrust checks from Ava Anthony, net of repayments, totaling $16,500.  The IRS determined that the Mansours should have reported this amount as dividend income.

The Mansours received and deposited into their personal bank account at SunTrust checks from Mansour Enterprises, net of repayments, totaling $22,600.  The IRS determined that Mansour Enterprises was an S corporation during 1998 and that the Mansours had failed to establish their basis in their Mansour

Enterprises stock. Accordingly, because the Mansours reported income of $13,000 from the operations of Mansour Enterprises on their 1998 return, the IRS determined that the Mansours should have included an additional $9,600 in income as a result of these distributions.

### 3. Other Income

The Mansours received and deposited into their personal bank account at SunTrust unexplained amounts of cash and checks from sources other than their business entities or those reported on their income tax return totaling $122,853. The IRS determined that the Mansours should have reported this amount on their 1998 return as income from self-employment.

### D. 1999

The IRS made the following determinations with respect to the Mansours for 1999:

### 1. Disallowance of Long-Term Capital Loss Carryover

The long-term capital loss carryover of $3,430 that was reported on the Mansours' 1999 return was disallowed because it resulted from their reporting a capital loss rather than a capital gain from the transaction between Tomson and Sembler on their 1998 return. The IRS adjusted the Mansours' income to account for this disallowance.

### 2. Corporate Distributions

The Mansours received and deposited into their personal bank account at SunTrust checks from Mansour Enterprises, net of repayments, totaling $32,675. The IRS determined that Mansour Enterprises was an S corporation during 1999 and that the Mansours had failed to establish their basis in their Mansour Enterprises stock. Accordingly, because the Mansours reported income of $5,700 from the operations of Mansour Enterprises on their 1999 return, the IRS determined that the Mansours should have included an additional $26,975 in income as a result of these distributions.

### 3. Other Income

The Mansours received and deposited into their personal bank account at SunTrust unexplained amounts of cash and checks from sources other than their business entities or those reported on their income tax return totaling $112,407. The IRS determined that the Mansours should have reported this amount on their 1999 return as income from self-employment.

Examination of the Gownis' Income Tax Returns for 1998 and 1999

The examination of the Gownis' income tax returns for 1998 and 1999 began in October 2000 as a result of the identification of a common issue concerning the loss claimed in 1998 with respect to Tomson. The Gownis executed a power of attorney in favor of Bradshaw with respect to their income tax returns for

1998 and 1999. During the examination of the Gownis' income tax returns, the IRS made requests for copies of workpapers and bank statements. Because the Gownis did not produce adequate records with respect to those requests, the IRS summonsed the Gownis' bank records in order to make an appropriate determination of their income for those years.

In determining the Gownis' income for 1998, the IRS summonsed and evaluated copies of (1) the bank statements from, checks written for more than $500 on, and any items that were listed on deposit tickets totaling $500 or more that were deposited to the Gownis' personal bank accounts at NationsBank, First Union, Great Western Bank, Washington Mutual Bank, and SunTrust for that year and (2) the statements from the Gownis' personal VISA account for that year. In determining the Gownis' income for 1999, the IRS summonsed and evaluated copies of the bank statements from, checks written for more than $500 on, and any items that were listed on deposit tickets totaling $500 or more that were deposited to the Gownis' personal bank accounts at NationsBank, Washington Mutual Bank, and SunTrust for that year. In addition, the IRS summonsed and evaluated the following sources of information for purposes of determining the Gownis' income for 1998 and 1999: (1) Additional documents from NationsBank pertaining to the Gownis' certificate of deposit; (2) information related to the Gownis from the Money Transfer

Query System at Bank of America; (3) a copy of NationsBank's records concerning a loan to Mr. Gowni in 1996; (4) a copy of NationsBank's records concerning a loan to Mr. Gowni in 1997; (5) a copy of NationsBank's records concerning a loan to Mr. Gowni in 1999; and (6) a copy of NationsBank's records concerning a loan to Ava Anthony in 1999. During the examination of the Gownis' bank records, the IRS requested that the Gownis provide documentation and explanations as to any nontaxable items that were deposited to their personal bank accounts. The IRS received information about Mina of Sanford's shareholder loan account in response to those requests.

The examination of the Gownis' income tax returns for 1998 and 1999 and the evaluation and analysis of their bank records and other information took approximately 1 year and consumed more than 150 hours of revenue agent time.

Results of the Examination of the Gownis' Income Tax Returns

   A.   1998

The IRS made the following determinations with respect to the Gownis for 1998:

      1.   Distributable Gain From the Sale of Property by
           Tomson

Tomson had a $413,696 basis in the property that it sold to Sembler and recognized a $408,304 gain on the sale. The IRS determined that Tomson was an S corporation during 1998 and that $204,152 of this gain was attributable to the Gownis. Because

the Gownis reported a $45,000 loss from this sale on their 1998 return, the IRS adjusted the Gownis' income to reflect this gain.

### 2. Corporate Distributions

The Gownis received and deposited into their personal bank accounts checks from Ava Anthony, net of repayments, totaling $13,640. The IRS determined that the Gownis should have reported this amount as dividend income.

The Gownis received and deposited into their personal bank accounts checks from Tomson, net of repayments, totaling $101,000. The IRS determined that these distributions were made from sources other than the proceeds of the transaction between Tomson and Sembler. Therefore, the IRS determined that the Gownis should have included this amount in income.

### 3. Other Income

The Gownis received and deposited into their personal bank accounts unexplained amounts of cash and checks from sources other than their business entities or those reported on their income tax return totaling $80,868. The IRS determined that the Gownis should have reported this amount on their 1998 return as income from self-employment.

### B. 1999

The IRS made the following determinations with respect to the Gownis for 1999:

### 1.  Disallowance of Long-Term Capital Loss Carryover

The long-term capital loss carryover of $42,000 that was reported on the Gownis' 1999 return was disallowed because it resulted from their reporting a capital loss rather than a capital gain from the transaction between Tomson and Sembler on their 1998 return.  The IRS adjusted the Gownis' income to account for this disallowance.

### 2.  Corporate Distributions

The Gownis received and deposited into their personal bank accounts checks from Tomson, net of repayments, totaling $50,610. The IRS determined that Tomson was an S corporation during 1999 and that these distributions were made from sources other than the proceeds of the transaction between Tomson and Sembler. Therefore, the IRS determined that the Gownis should have included this amount in income.

The Gownis received and deposited into their personal bank accounts checks from Mina of Forest City, net of repayments, totaling $63,277.  The IRS determined that Mina of Forest City was an S corporation during 1999.  Accordingly, the IRS determined the net taxable distribution that the Gownis received from Mina of Forest City by reducing this $63,277 amount by one-half of the ending balance of the accumulated adjustments account reported on Mina of Forest City's Form 1120S filed for

1998.  As a result, the IRS determined that the Gownis should have included an additional $30,937 in income.

The Gownis received and deposited into their personal bank accounts checks from Bishoy, net of repayments, totaling $32,614.  The IRS determined that Bishoy was an S corporation during 1999.  Accordingly, the IRS determined the net taxable distribution that the Gownis received from Bishoy by reducing this $32,614 amount by (1) the amount of income that the Gownis reported from the operations of Bishoy on their 1999 return and (2) one-half of the ending balance of the accumulated adjustments account reported on Bishoy's Form 1120S filed for 1998.  As a result, the IRS determined that the Gownis should have included an additional $20,677 in income.

The Gownis received and deposited into their personal bank accounts checks from Pyramid, net of repayments, totaling $39,641.  The IRS could not determine whether Pyramid was an S corporation during 1999.  The IRS did, however, determine that the Gownis should have included this amount in income.

### 3.  Other Income

The Gownis received and deposited into their personal bank accounts unexplained amounts of cash and checks from sources other than their business entities or those reported on their income tax return totaling $180,781.  The IRS determined that the

Gownis should have reported this amount on their 1999 return as income from self-employment.

Procedural Matters

The Gownis and the Mansours filed their respective petitions with the Court on May 3, 2002. Included in the Mansours' petition was the following statement:

> 5. The facts upon which Petitioners rely, as the basis of their case, are as follows:
>
>        *    *    *    *    *    *    *
>
>        d. Petitioners' [sic] can prove that the gross income they reported in 1996 through 1999 represented their worldwide gross taxable income and that all other bank deposits constitute non-taxable income.

The Gownis included a similar statement in their petition as to the years 1998 and 1999.

On April 22, 2003, the Court served on petitioners Notices Setting Case for Trial. Attached to the Notices Setting Case for Trial was the Court's Standing Pretrial Order. The Standing Pretrial Order provided, in pertinent part, as follows:

> To facilitate an orderly and efficient disposition of all cases on the trial calendar, it is hereby
>
> ORDERED that all facts shall be stipulated to the maximum extent possible. All documentary and written evidence shall be marked and stipulated in accordance with Rule 91(b), unless the evidence is to be used solely to impeach the credibility of a witness. * * * Any documents or materials which a party expects to utilize in the event of trial (except solely for impeachment), but which are not stipulated, shall be identified in writing and exchanged by the parties at least 14 days before the first day of the trial

session.  The Court may refuse to receive in evidence any document or material not so stipulated or exchanged, unless otherwise agreed by the parties or allowed by the Court for good cause shown.  * * *

On July 8, 2003, respondent served on petitioners Respondent's Interrogatories to Petitioners (interrogatories) and Respondent's Request for Production of Documents (requests for production of documents).  The interrogatories that were served on the Mansours requested, inter alia, that they describe the nature, amount, and date of the (1) payments received from Micca in 1996; (2) payments received from Ava Anthony in 1998; (3) deposits to their personal bank account at First Union in 1996 and 1997; (4) deposits to their personal bank account at SunTrust in 1997, 1998, and 1999; (5) payments to and from Mina of Forest City and Mina of Sanford in 1996; and (6) deposits to the bank accounts of Mansour Enterprises in 1999.  The interrogatories that were served on the Gownis requested, inter alia, that they describe the nature, amount, and date of the (1) deposits to their personal bank accounts at Washington Mutual Bank, First Union, NationsBank, and SunTrust in 1998 and 1999 and (2) deposits to the bank accounts of Ava Anthony, Tomson, Mina of Forest City, Pyramid, and Bishoy in 1998 and 1999.  The requests for production of documents that were served on petitioners requested, inter alia, all documents and records that (1) proved that the gross income that the Mansours reported in 1996, 1997, 1998, and 1999 and that the Gownis reported in 1998 and 1999

represented their respective worldwide taxable income for those years and that all other bank deposits were nontaxable sources of income and (2) pertained to the matter about which respondent inquired in respondent's written interrogatories. Petitioners did not respond to either the interrogatories or the requests for production of documents.

On August 11, 2003, respondent filed with the Court in these cases motions to compel responses to respondent's interrogatories and motions to compel production of documents. On August 14, 2003, the Court issued Orders that directed petitioners, in pertinent part, as follows:

> ORDERED: That so much of respondent's * * * motions that seeks an order directing compliance with Respondent's Interrogatories to Petitioners and Respondent's Request for Production of Documents, both served on July 8, 2003, is granted, and petitioners shall, on or before September 2, 2003, (1) produce to counsel for respondent those responses requested in Respondent's Interrogatories to Petitioners served on petitioners on July 8, 2003, and (2) produce to counsel for respondent those documents requested in Respondent's Request for Production of Documents served on petitioners on July 8, 2003. * * *

Petitioners did not comply with the Court's Orders.

OPINION

Respondent's Use of the Bank Deposits Method

Taxpayers bear the responsibility to maintain books and records that are sufficient to establish their income. See sec. 6001; DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992); sec. 1.446-1(a)(4), Income Tax Regs; see

also <u>Estate of Mason v. Commissioner</u>, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). When a taxpayer fails to keep adequate books and records, the Commissioner is authorized to determine the existence and amount of the taxpayer's income by any method that clearly reflects income. Sec. 446(b); <u>Mallette Bros. Const. Co. v. United States</u>, 695 F.2d 145, 148 (5th Cir. 1983); <u>Webb v. Commissioner</u>, 394 F.2d 366, 371-372 (5th Cir. 1968), affg. T.C. Memo. 1966-81; see also <u>Holland v. United States</u>, 348 U.S. 121, 131-132 (1954). The Commissioner's reconstruction of a taxpayer's income need only be reasonable in light of all surrounding facts and circumstances. <u>Schroeder v. Commissioner</u>, 40 T.C. 30, 33 (1963); see also <u>Giddio v. Commissioner</u>, 54 T.C. 1530, 1533 (1970). The Commissioner is given latitude in determining which method of reconstruction to apply when taxpayers fail to maintain adequate books and records. <u>Boyett v. Commissioner</u>, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court dated Mar. 14, 1951; <u>Kenney v. Commissioner</u>, 111 F.2d 374, 375 (5th Cir. 1940), affg. a Memorandum Opinion of this Court dated July 28, 1938; <u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 693 (1989). The method of reconstruction employed by the Commissioner is not invalidated solely because the Commissioner's income determination may not be completely correct. <u>DiLeo v. Commissioner</u>, <u>supra</u> at 868; see also <u>Marcello v. Commissioner</u>, 380 F.2d 494, 497 (5th Cir. 1967),

affg. in part and revg. in part T.C. Memo. 1964-302; Halle v. Commissioner, 175 F.2d 500, 502-503 (2d Cir. 1949), affg. 7 T.C. 245 (1946).

Respondent chose to apply the bank deposits method in these cases because petitioners failed to maintain adequate books and records for the years in issue.  A bank deposit is prima facie evidence of income.  Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); see also Clayton v. Commissioner, 102 T.C. 632, 645 (1994); DiLeo v. Commissioner, supra at 868; Estate of Mason v. Commissioner, supra at 657.  When a taxpayer keeps no books or records and has large bank deposits, the Commissioner is not acting arbitrarily or capriciously by resorting to the bank deposits method.  DiLeo v. Commissioner, supra at 867.  The bank deposits method of reconstruction assumes that all of the money deposited into a taxpayer's account is taxable income unless the taxpayer can show that the deposits are not taxable.  See id. at 868; see also Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964).  The Commissioner need not show a likely source of the income when using the bank deposits method, but the Commissioner must take into account any nontaxable items or deductible expenses of which the Commissioner has knowledge.  See Price v. United States, supra at 677; Tokarski v. Commissioner, supra at 77.

Respondent used the bank deposits method to identify two sources of unreported income. The first source was determined from checks written from the corporate bank accounts of petitioners' business entities and deposited into petitioners' personal bank accounts. The second source was determined from deposits of unexplained amounts of cash and checks from sources other than petitioners' business entities or those reported on petitioners' income tax returns into petitioners' personal bank accounts. Respondent submitted into evidence copies of the bank records that disclosed all of the deposits to as well as the disbursements from petitioners' personal bank accounts during the years in issue. Respondent analyzed these bank records and prepared schedules that summarized the deposits to, disbursements from, and other transactions occurring in petitioners' personal bank accounts during those years. Respondent identified deposits that were not taxable or that were previously reported by petitioners. Consequently, respondent has properly reconstructed petitioners' income under the bank deposits method for the years in issue.

If the taxpayer contends that the Commissioner's use of the bank deposits method is unfair or inaccurate, the burden is on the taxpayer to show such unfairness or inaccuracy. Price v. United States, supra at 677. Petitioners must show either that respondent's computation of their income is inaccurate or that

the deposits made into their personal bank accounts are not taxable.  See Marcello v. Commissioner, 380 F.2d 509, 511 (5th Cir. 1967), affg. T.C. Memo. 1964-303; Price v. United States, supra at 678; DiLeo v. Commissioner, 96 T.C. at 871.  The burden of proof in these cases has not shifted to respondent under section 7491 because petitioners failed to maintain adequate books and records and to cooperate with reasonable requests for information and documents.  See sec. 7491(a)(2).

A.  Distributions From Petitioners' Business Entities

Respondent determined that the Mansours received and failed to report dividend distributions from two C corporations:  Micca in 1996 and Ava Anthony in 1998.  Respondent also determined that the Mansours received and failed to report distributions from three S corporations:  Mina of Forest City in 1996, Mina of Sanford in 1996, and Mansour Enterprises in 1998 and 1999.  With respect to the Gownis, respondent determined that they received and failed to report dividend distributions from one C corporation:  Ava Anthony in 1998.  Respondent also determined that the Gownis received and failed to report distributions from three S corporations:  Tomson in 1998 and 1999, Mina of Forest City in 1999, and Bishoy in 1999.  In addition, respondent determined that the Gownis received and failed to report distributions from Pyramid in 1999.  Respondent did not make a determination as to Pyramid's status in 1999, and there is no

evidence in the record that indicates whether Pyramid elected to be taxed under subchapter S at the time that it made distributions to the Gownis in 1999.

At trial, respondent conceded that a mathematical error had occurred during the analysis of the checks that the Gownis received from Ava Anthony and deposited into their personal bank accounts during 1998. Accordingly, the amount of the checks that the Gownis received from Ava Anthony and deposited into their personal bank accounts, net of repayments, must be adjusted from $13,640 to $1,640 for 1998 to reflect this concession.

### 1. Petitioners' Arguments

Except for the concession that petitioners achieved with respect to the dividend distribution that the Gownis received from Ava Anthony in 1998, petitioners have not challenged the computational accuracy of respondent's analysis of the deposits of checks from petitioners' business entities into petitioners' personal bank accounts. Petitioners have, however, asserted several arguments as to the nontaxable nature of some of the distributions that they received from three of their business entities. Specifically, petitioners argue that (1) the distributions that the Gownis received from Mina of Forest City and Bishoy in 1999 were repayments of loans that the Gownis had made to those entities in prior years; (2) respondent failed to offset the distributions that the Gownis received from Tomson in

1998 and 1999 against their basis in their Tomson stock; and (3) $50,000 of the distribution that the Mansours received from Micca in 1996 was not taxable because Mr. Mansour used that amount to buy out another shareholder's interest in Micca.  We address each of these arguments in turn.

 2.   Repayment of Shareholder Loans by Mina of Forest
      City and Bishoy

Whether a withdrawal of funds by a shareholder from a corporation or an advance made by a shareholder to a corporation creates a true debtor-creditor relationship is a factual question to be decided based on all of the relevant facts and circumstances.  Haag v. Commissioner, 88 T.C. 604, 615 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988); see also Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970); Roschuni v. Commissioner, 29 T.C. 1193, 1201-1202 (1958), affd. 271 F.2d 267 (5th Cir. 1959).  For disbursements to constitute true loans, there must have been, at the time that the funds were transferred, an unconditional obligation on the part of the transferee to repay the money and an unconditional intention on the part of the transferor to secure repayment.  Haag v. Commissioner, supra at 615-616; see also Haber v. Commissioner, supra at 266.  Direct evidence of a taxpayer's state of mind is generally unavailable, so courts have focused on certain objective factors to distinguish repayments of bona fide loans from disguised dividends, compensation, and

contributions to capital.  The factors considered relevant for purposes of identifying bona fide loans include (1) the existence or nonexistence of a debt instrument; (2) provisions for security, interest payments, and a fixed payment date; (3) treatment of the funds on the corporation's books; (4) whether repayments were made; (5) the extent of the shareholder's participation in management; and (6) the effect of the "loan" on the shareholder/employee's salary.  Haber v. Commissioner, supra at 266; see also In re Indian Lake Estates, Inc., 448 F.2d 574, 578-579 (5th Cir. 1971); Haag v. Commissioner, supra at 616-617 & n.6.  When the individuals are in substantial control of the corporation, as petitioners were in these cases, such control invites a special scrutiny of the situation.  Haber v. Commissioner, supra at 266; Roschuni v. Commissioner, supra at 1202.  For the reasons set forth below, we conclude that the facts of record do not support the Gownis' attempt to characterize the distributions that they received from Mina of Forest City and Bishoy in 1999 as repayments of bona fide loans.

First, no note or other evidence of indebtedness representing the amount or existence of the shareholder loans was given to the Gownis by Mina of Forest City or Bishoy.

Second, no evidence indicates that Mina of Forest City or Bishoy provided any collateral or security for repayment of these purported loan amounts or that the corporations made any

agreement with the Gownis as to the time of repayment or the interest to be paid.

Third, whether the amounts contributed by the Gownis to Mina of Forest City and Bishoy were treated as loans or as contributions to capital by the corporations is not established because the corporate books of Mina of Forest City and Bishoy were never offered into evidence.

Fourth, the Gownis have failed to establish the amounts of the allegedly outstanding loans due to them from Mina of Forest City and Bishoy for 1999. Petitioners contend that the Schedules L, Balance Sheets per Books, attached to the Forms 1120S filed by Mina of Forest City in 1998 and Bishoy in 1999 support the conclusion that the Gownis made loans to these corporations. While the Schedules L indicate that there are loans from shareholders outstanding for Mina of Forest City and Bishoy, they do not establish the amount of the outstanding shareholder loans due to the Gownis for 1999. (Moreover, on Mr. Gowni's Schedule K-1, Shareholder's Share of Income, Credits, Deductions, etc., that is attached to Bishoy's Form 1120S for 1999, there is no amount of repayment listed on line 21, "Amount of loan repayments for 'Loans from Shareholders'".) The schedule of purported loans prepared by Mr. Gowni is also insufficient to establish the outstanding shareholder loan amounts due to the Gownis from Mina of Forest City and Bishoy for 1999 because it details only the amounts that the Gownis paid to Mina of Forest

City and Bishoy during the course of their ownership and does not include an analysis of the amounts that these corporations paid to the Gownis prior to 1999. Without knowing the amounts of the outstanding shareholder loans due to the Gownis from Mina of Forest City and Bishoy for 1999, it is impossible to determine the amount of the distributions that the Gownis received from these corporations during 1999 that could be characterized as repayment of these loans.

Fifth, the Gownis have not established how much compensation Mr. Gowni received for the services that he provided for Mina of Forest City and Bishoy. Mr. Gowni testified that he worked 10 hours per day 5-6 days per week for his business entities (including Mina of Forest City and Bishoy) during the years in issue. It is unlikely that Mr. Gowni received no compensation for those services. It is more likely than not that the distributions were compensation rather than loan repayments.

We conclude that the Gownis did not intend to create a true debtor-creditor relationship with Mina of Forest City and Bishoy. The Gownis treated these entities as their own personal bank, depositing and withdrawing funds at will. Accordingly, we sustain respondent's contention that the distributions that the Gownis received from Mina of Forest City and Bishoy during 1999 did not constitute repayment of bona fide loans.

### 3.  Offset of the Gownis' Basis in Their Tomson Stock

By a Stipulation of Settled Issues, the parties agreed to certain elements of the calculation of the capital gain resulting from Tomson's sale of property to Sembler in 1998.  They also stipulated that "any properly allowable capital costs that the petitioners can establish with regard to equipment rental of Tomson, Inc. [that] related to gasoline dispenser rentals" would be taken into account in this calculation.  Petitioners have not established that Tomson incurred any capital costs for equipment rentals related to gasoline dispensers.  Consequently, the capital gain will be calculated in accordance with the agreed upon elements.

Petitioners contend that the gain generated by the transaction between Tomson and Sembler increased their basis in their Tomson stock, and, as a result, the payments made by Tomson to the Gownis in 1998 and 1999 should not be included in the Gownis' income because the Gownis' stock basis should have been sufficient to offset the amount of these payments.  Respondent asserts that the Gownis should have included the amounts of these distributions in income.

The parties agree that the Gownis should have reported 50 percent of the capital gain that resulted from Tomson's sale of property to Sembler in 1998.  Consequently, the Gownis' basis in their Tomson stock should be increased to account for their distributable share of the gain.  Sec. 1367(a)(1); see also sec.

1.1367-1(b), (d)(1), Income Tax Regs. Respondent does not account for the Gownis' increased basis in their Tomson stock in arguing that the payments that the Gownis received from Tomson during 1998 and 1999 should be included in income. Instead, respondent contends that Tomson could not have made a "distribution" to the Gownis after May 29, 1998, because Tomson's checking account balance was $8,177 on that date. Respondent appears to be arguing that a corporation's checking account balance is determinative on the issue of whether a corporation made a distribution of property to a shareholder. Respondent does not cite any authority for this proposition, and we see no reason to adopt such an arbitrary approach.

Section 1368(a) directs that a distribution of property made by an S corporation with respect to its stock is generally treated in the manner provided in either section 1368(b) or section 1368(c), whichever applies. For purposes of section 1368(a), "property" means money, securities, and any other property, except that such term does not include stock in the corporation making the distribution (or rights to acquire such stock). Sec. 317(a). Respondent determined that the Gownis received distributions of money from Tomson in 1998 and 1999 totaling $101,000 and $50,610, respectively. Respondent has not argued that these distributions were made to the Gownis for any reason other than their ownership of Tomson stock. Consequently, section 1368(a) governs the treatment of these distributions.

The record in these cases fails to establish that Tomson had accumulated earnings and profits as of the end of 1998 or 1999. Therefore, section 1368(b) sets out the manner in which the distributions will be treated. Sec. 1.1368-1(c), Income Tax Regs. Under section 1368(b)(1), a distribution shall not be included in a shareholder's gross income to the extent that it does not exceed the shareholder's adjusted basis in the corporation's stock. If the amount of the distribution exceeds the shareholder's adjusted basis in the corporation's stock, such excess shall be treated as gain from the sale or exchange of property. Sec. 1368(b)(2).

With respect to 1998, the $101,000 distribution that the Gownis received from Tomson should be included in income only to the extent that it exceeds the Gownis' basis in their Tomson stock, which, as discussed above, must be determined by taking into account the Gownis' share of the gain recognized by Tomson on its sale to Sembler. The portion of this distribution that is a nontaxable return of capital must be taken into account under section 1367(a)(2) and must decrease the Gownis' basis in their Tomson stock accordingly. These calculations should be made incident to Rule 155 computations in these cases.

With respect to 1999, the $50,610 distribution that the Gownis received from Tomson should be included in income only to the extent that it exceeds the Gownis' basis in their Tomson stock as calculated at the end of 1998. The portion of this

distribution that is a nontaxable return of capital must also be taken into account under section 1367(a)(2) and must decrease the Gownis' basis in their Tomson stock accordingly.  These calculations also should be made incident to Rule 155 computations in these cases.

4.  <u>The Nature of the Distribution From Micca</u>

Respondent determined that the Mansours received a $52,000 dividend distribution from Micca in 1996.  Petitioners contend that $50,000 of this distribution is not taxable because Mr. Mansour used that amount "to facilitate Micca's redemption of the shares of a minority shareholder, Fouad Aycab."  Petitioners do not cite any authority that supports this contention.  Furthermore, the facts upon which petitioners base this contention are limited to Mr. Mansour's uncorroborated, inconsistent, and confusing testimony in response to leading questions.  The unreliable quality of the testimony is shown by the following passage:

> Q  [By petitioners' counsel]  There's a memo in there.  What does that say?  Do you see the memo in the middle?
>
> A  [By Mr. Mansour]  It says, Buying partner.
>
> Q  Buying partner, okay.  So the money that you received from Micca, you sent to Mr. Ayoub [sic].  You said this was a repayment of a loan or a buyout of him?
>
> A  Yes, sir.
>
> Q  Did he own an interest in Micca?
>
> A  No, sir.

Q Okay. So this wouldn't have been a buyout of him, would it?

A Most likely it was a loan then.

Q Okay, but you paid it to him. Why didn't the company just pay it to him? Why was it done this way?

A I cannot recall what happened actually, but I guess to get me an immediate credit. Back then, that's the only way it could be done, to give him his money before he leaves.

Accordingly, we sustain respondent's determination that the Mansours received a $52,000 dividend distribution from Micca in 1996.

B. Petitioners' "Other Income"

Petitioners have not challenged the computational accuracy of respondent's analysis of the deposits of unexplained amounts of cash and checks from sources other than petitioners' business entities or those reported on petitioners' income tax returns into petitioners' personal bank accounts. Petitioners have presented neither evidence nor argument that these deposits are not taxable or that these deposits do not represent income from self-employment. Consequently, we hold that petitioners understated the income that they received from self-employment in the amounts set forth in the notices of deficiency.

C. Summary

An examination of the record indicates that respondent's determination of petitioners' income for each of the years in issue was not completely correct. The burden was on petitioners,

however, to address these errors and to provide alternative analyses. The errors do not invalidate respondent's use of the bank deposits method in these cases, which was necessitated by petitioners' failure to maintain adequate books and records for themselves as well as for the corporations that they owned and controlled. Petitioners' vague assertions, unsupported by corroborating records or documents, are not reliable or persuasive. If documentation existed, it should have been produced in response to discovery and/or exchanged with respondent in accordance with the Court's Standing Pretrial Order and the Court's Orders of August 14, 2003. Therefore, except to the extent discussed above, respondent's determinations of petitioners' income for the years in issue are sustained.

## Additions to Tax and Accuracy-Related Penalties

Respondent determined an addition to tax under section 6651(a)(1) with respect to the Mansours for 1996 and with respect to the Gownis for 1999 as a result of their failure to file timely returns for those years. Petitioners have presented neither evidence nor argument regarding the addition to tax.

The Commissioner has the burden of production under section 7491(c) and must come forward with sufficient evidence indicating that it is appropriate to impose the penalty. Respondent has met that burden of production in these cases by showing that the returns were late. Respondent determined the addition to tax for late filing for the Mansours because the Mansours' 1996 return

was not filed until September 1998.  Respondent determined the addition to tax for late filing for the Gownis because, although the Gownis were granted an extension to file until October 15, 2000, the Gownis' 1999 return was not filed until November 2000.

To escape the addition to tax for filing late returns, petitioners have the burden of proving that the failure to file did not result from willful neglect and that the failure was due to reasonable cause.  See United States v. Boyle, 469 U.S. 241, 245 (1985).  Because petitioners failed to present any explanation as to their late filing, they remain liable under section 6651.

Respondent determined accuracy-related penalties with respect to petitioners under section 6662(a) for one or more of the following reasons:  (1) Negligence or disregard of rules or regulations or (2) any substantial understatement of income tax.  Petitioners argue that the accuracy-related penalties should not be imposed because of their reliance on Bradshaw.

Under section 6662(a), a taxpayer may be liable for a penalty of 20 percent on the portion of an underpayment of tax due to, inter alia, negligence or disregard of the rules or regulations or any substantial understatement of income tax.  Sec. 6662(b)(1) and (2).  The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return.  Sec.

6662(c); sec. 1.6662-3(b)(1), Income Tax Regs.  The term "disregard" includes any careless, reckless, or intentional disregard.  Sec. 6662(c).  An understatement of income tax is "substantial" if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).  An "understatement" is defined as the excess of the tax required to be shown on the return over the tax actually shown on the return, less any rebate.  Sec. 6662(d)(2)(A).

The Commissioner has the burden of production under section 7491(c) and must come forward with sufficient evidence indicating that it is appropriate to impose the penalty.  See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  Because the understatement on each of petitioners' returns satisfies the definition of "substantial", respondent has met that burden of production in these cases.  Once the Commissioner meets the burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect.  Id. at 447.

The section 6662(a) penalty will not be imposed with respect to any portion of the underpayment as to which the taxpayer acted with reasonable cause and in good faith.  Sec. 6664(c)(1); see also Higbee v. Commissioner, supra at 448.  The decision as to whether a taxpayer acted with reasonable cause and in good faith is made by taking into account all of the pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  Relevant

factors include the taxpayer's efforts to assess his or her proper tax liability, including the taxpayer's reasonable and good faith reliance on the advice of a tax professional. See id.; see also sec. 1.6664-4(c), Income Tax Regs.

The record in these cases negates any mitigation by reasonable cause. Petitioners' failure to maintain adequate books and records constitutes negligence, particularly when that failure resulted in substantial underreporting of income. See sec. 6662(c). Bradshaw handled only part of petitioners' income-producing activities. Petitioners did not take Bradshaw's advice that corporate funds should not be deposited in their personal bank accounts. They did not provide to him accurate and complete information concerning income. We do not believe that they relied on him reasonably or in good faith. Accordingly, the accuracy-related penalties determined by respondent are sustained.

We have considered the arguments of the parties that were not specifically addressed in this opinion. Those arguments are either without merit or irrelevant to our decision.

To reflect the foregoing and the concessions of the parties,

Decisions will be entered

under Rule 155.