# United States Tax Court

T.C. Memo. 2024-91

RALPH M. OTTUSO,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 23305-18.                    Filed September 26, 2024.

————

Ralph M. Ottuso, pro se.

*Christopher D. Davis*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

COPELAND, *Judge*: In 2014 (year at issue) Petitioner, Ralph Ottuso, ran a store called Pine Lake Stoves & Fireplaces (Pine Lake) in Caroga, New York. Pine Lake sold and installed stoves and built fireplaces for its customers. Mr. Ottuso disagrees with the Commissioner about Pine Lake's gross receipts for the year at issue, as well as its allowable depreciation and gasoline expense deductions. Mr. Ottuso further contends that he had reasonable cause for failing to timely file a return and pay his 2014 tax.

## FINDINGS OF FACT

Mr. Ottuso resided in New York when he timely filed his Petition.

### I.   *Gasoline Purchases*

During the year at issue Pine Lake used three vehicles for its business: a one-ton, 16-foot box truck for delivering stoves, a pickup

[*2] truck, and a service van.  All three vehicles were lettered on their exteriors with the name "Pine Lake Stoves & Fireplaces."

Pine Lake had an ongoing credit arrangement with Canada Lake Store & Marine (Canada Lake), which sold gasoline in Caroga.  The three Pine Lake vehicles could fill up at Canada Lake without immediate payment.  The unpaid gasoline charges were added to Pine Lake's account with Canada Lake, which sent Pine Lake a bill each month covering that month's charges plus any outstanding charges from previous months.  Pine Lake had to make partial payment each month but was not required to fully satisfy the bill.  In each month from May to December 2014 Pine Lake paid Canada Lake an amount between $1,000[1] and $3,000, totaling $14,500 across those seven months.[2]

II.    *Equipment Purchases*

Pine Lake's physical premises consisted of (1) a shop and a parking lot that sat on a one-acre lot and (2) a warehouse on an adjoining one-acre lot.  During the year at issue Mr. Ottuso bought a riding mower, a front-load tractor, and a camouflage Ambush Bad Boy Buggy (buggy)—an open-air motorized cart—for use at Pine Lake's premises.  He purchased the mower ($12,600) and the tractor ($66,000) in Oklahoma in April 2014.  In connection with purchasing the tractor partially on credit (with a loan term of four years beginning April 24, 2018), he incurred a $20 filing fee, a $125 "documentary" fee, and a $3,218 property insurance fee.  (The property insurance covered the tractor for the duration of the loan term.)  Mr. Ottuso had the mower and tractor shipped to New York on August 8, 2014, and they were placed in service by September 2014.

Mr. Ottuso purchased the buggy ($15,118) in New York on October 22, 2014, from Alpin Haus Ski Shop (Alpin Haus), which accepted a trade-in of Mr. Ottuso's motorhome, then valued at $50,000.  Alpin Haus gave him a check for the $34,882 balance.

In the year at issue Mr. Ottuso's personal residence was next door to the Pine Lake shop.  Sometime after that year he began residing at a ranch in McAlester, Oklahoma, that he had already owned during the

---

[1] All dollar amounts in this Opinion are rounded to the nearest dollar.

[2] The record does not include evidence of payments to Canada Lake before May 2014.

[*3] year at issue and that in later years he used for hunting and farming businesses.

III.  *Tax Returns, Notice of Deficiency, and Bank Deposits Analysis*

Mr. Ottuso received an automatic six-month extension of the deadline to file his 2014 federal income tax return.  After he failed to file a return by the extended deadline of October 15, 2015, the Commissioner prepared a substitute for return (SFR) on the basis of third-party information reports and executed the SFR on April 16, 2018.  *See* I.R.C. § 6020(b).[3]  The Commissioner then issued a Notice of Deficiency on August 20, 2018, determining that for the year at issue Mr. Ottuso received a total of $32,242 in wages, $387,124 in business gross receipts, and $3,000 in rental income.  The Commissioner also determined that Mr. Ottuso was liable for failure-to-timely-file and failure-to-timely-pay additions to tax under section 6651(a)(1) and (2).

After receiving the Notice of Deficiency, Mr. Ottuso filed his Petition in November 2018, contending that the Commissioner's determinations were "based on estimates and assumptions of income only[,] with no regard to expenses."  The Internal Revenue Service (IRS) then assigned Revenue Agent (RA) Heidi Bogdan to conduct a bank deposits analysis for Mr. Ottuso's 2014 tax year.  Using deposit records and canceled checks from three bank accounts (one in Mr. Ottuso's name,[4] the others in the name of Pine Lake), RA Bogdan calculated that Pine Lake had taxable business gross receipts of $1,269,419[5] that Mr. Ottuso should have reported on Schedule C, Profit or Loss From Business, of a 2014 Form 1040, U.S. Individual Income Tax Return.[6] The Commissioner then filed an Amended Answer to that effect.

---

[3] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C.), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[4] RA Bogdan included the account held in Mr. Ottuso's own name in the bank deposits analysis because deposits into that account consisted predominantly if not exclusively of credit card payments made through First Data Merchant Services (which we find are connected with Pine Lake sales) and checks made out to Pine Lake.

[5] In making the $1,269,419 gross receipts calculation, RA Bogdan excluded any deposits identified in the bank records as interaccount transfers (whether made by wire or by check), returned items, fee reversals, or expense reimbursements.

[6] After trial Mr. Ottuso sought to introduce evidence that Pine Lake was incorporated during the year at issue and that Pine Lake's income after the date of incorporation was not Schedule C income.  We denied Mr. Ottuso's Motion to Reopen

**[\*4]**    In July 2020 Mr. Ottuso submitted to the Commissioner's counsel in this case a signed 2014 Form 1040.  On that return Mr. Ottuso reported (among other items) $14,000 in wage income, $961,480 of Schedule C gross receipts, $115 of rental loss, and $36,184 of proceeds from the sale of a "2008 Chevy Duramax 2500 HD" truck with a cost basis of $47,000.  For the "Sch C STOVES, FIREPLACES" business he attached Form 4562, Depreciation and Amortization, on which he claimed (among other things) a section 179 deduction for the mower, the tractor, and a "Chevy Silverado 2015" truck.

IV.    *Settled Issues*

Before and during trial the parties conceded the following with respect to the year at issue:

1.    Mr. Ottuso conceded that he received $32,242 in wages,[7] $25 of taxable interest, and $200 of taxable qualified dividends.  The Commissioner conceded that Mr. Ottuso paid $29,174 in deductible interest and $14,391 in deductible taxes.

2.    The Commissioner conceded that the $1,269,419 of gross receipts calculated by RA Bogdan included the following that should be removed from the calculation: (i) $100,000 of loan proceeds, (ii) $36,184 of proceeds from Mr. Ottuso's personal sale of a Chevrolet truck, and (iii) $48,000 of rental income (which should have been reported on Schedule E, Supplemental Income and Loss, rather than Schedule C).

the Record owing to his excessive and unjustified delay in presenting this evidence. We therefore proceed on the assumption (largely reflected in the parties' Stipulations of Facts and Stipulations of Settled Issues) that Mr. Ottuso operated Pine Lake as a sole proprietorship throughout the year at issue.

[7] The conceded wage amount consists of $10,213 from the Town of Caroga, $8,029 from Fulton County, and $14,000 from Pine Lake.  We are treating Pine Lake as a sole proprietorship for the full year at issue, *see supra* note 6, so it might seem incongruous to accept Mr. Ottuso's stipulation that he received wages from Pine Lake. However, as indicated below, the Commissioner has conceded that Mr. Ottuso may likewise deduct $18,700 of wage expenses.  Since the Commissioner's wage expense concession may include the $14,000 of conceded Pine Lake wages (although the parties' Stipulations of Settled Issues are unclear on this point), we will not disrupt either concession, as justice does not clearly require doing so.  *See* Rule 91(e).

[*5] 3. Both parties conceded that $34,866 of sales tax that was remitted to New York State should also be removed from the calculation of gross receipts by RA Bogdan.

4. The Commissioner conceded that Pine Lake had cost of goods sold of $648,590,[8] deductible gasoline expenses of $5,000, wage expenses of $18,700, depreciation expenses of $36,114, and various other deductible expenses totaling $129,662.

After these concessions, the Commissioner asserts that Pine Lake's gross receipts were $1,050,370. Mr. Ottuso contends that gross receipts were lower by at least $34,200. Specifically, he claims that a deposit of that amount into one of his bank accounts on September 2, 2014, was nontaxable.

V. *Issues for Decision*

In view of the concessions noted above, the issues we must decide for the year at issue are as follows:

1. The correct amount of Pine Lake's gross receipts;

2. Whether Pine Lake qualifies for any deduction for gasoline expenses over $5,000;

3. Whether Pine Lake qualifies for a section 179 deduction with respect to the mower, the tractor, or the buggy;

4. Whether Pine Lake qualifies for any depreciation deduction for assets placed in service before 2014 or for any "other" depreciation; and

5. Whether Mr. Ottuso is liable for a failure-to-timely-file addition to tax under section 6651(a)(1) and a failure-to-timely-pay addition to tax under section 6651(a)(2).

---

[8] Gross receipts are reduced by cost of goods sold to arrive at gross income. Treas. Reg. § 1.61-3(a).

**[\*6]**                                      OPINION

I.      *Burden of Proof*

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous.[9]  *See* Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933).  However, as to income determinations, the U.S. Court of Appeals for the Second Circuit, to which appeal of this case would lie absent a contrary stipulation by the parties, *see* I.R.C. § 7482(b)(1)(A), has recognized an exception to the presumption that notices of deficiency are correct.[10]  If the Commissioner alleges that the taxpayer received more income than the taxpayer reported or otherwise agrees to, the Commissioner must provide evidence linking the taxpayer with some income-generating acts.  *See Llorente v. Commissioner*, 649 F.2d 152, 156 (2d Cir. 1981), *aff'g in part, rev'g in part* 74 T.C. 260 (1980).  Once the Commissioner makes the required threshold showing, normally the burden shifts to the taxpayer to prove by a preponderance of the evidence that the Commissioner's determinations are arbitrary or erroneous.  *See Hardy v. Commissioner*, 181 F.3d 1002, 1004 (9th Cir. 1999), *aff'g* T.C. Memo. 1997-97.  However, the Commissioner always bears the burden of proof with respect to any increases in deficiency (beyond that determined in the Notice of Deficiency) that are pleaded in an answer.  Rule 142(a)(1).

As to deductions, the burden of showing entitlement to a claimed deduction is on the taxpayer.  *See* Rule 142(a)(1); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992).  This burden requires the taxpayer to demonstrate that the deduction is allowable pursuant to some statutory provision and to substantiate the expenses allegedly giving rise to the deduction by maintaining and producing records adequate for the Commissioner to determine the taxpayer's correct liability.  I.R.C. § 6001; *Higbee v. Commissioner*, 116 T.C. 438, 440 (2001); *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976).

---

[9] Mr. Ottuso does not contend, nor does the evidence show, that the burden of proof has shifted to the Commissioner under section 7491(a) with respect to any factual issue.

[10] We follow all on-point precedent from a court of appeals to which an appeal of our decision would lie.  *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

**[\*7]**   If a taxpayer clearly shows that he incurred a deductible expense but is unable to substantiate the exact amount, the "*Cohan* rule" permits the Court to estimate the amount of the expense, provided there is a reasonable basis for doing so. *See Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930); *Vanicek v. Commissioner*, 85 T.C. 731, 742–43 (1985); *Goldsmith v. Commissioner*, 31 T.C. 56, 62 (1958). In making an estimate under the *Cohan* rule, the Court "bear[s] heavily if it chooses upon the taxpayer whose inexactitude is of his own making." *Cohan v. Commissioner*, 39 F.2d at 544. The Court may not use the *Cohan* rule to estimate expenses covered by the strict substantiation requirements of section 274(d), which apply to most transportation expenses. *Sanford v. Commissioner*, 50 T.C. 823, 827–28 (1968), *aff'd per curiam*, 412 F.2d 201 (2d Cir. 1969).

## II.   *Pine Lake's Gross Receipts*

### A.   *Bank Deposits Analysis*

If a taxpayer fails to maintain adequate records of income as required under section 6001, the Commissioner may reconstruct his income by any reasonable method that clearly reflects income. *See* I.R.C. § 446(b); *Holland v. United States*, 348 U.S. 121, 130–32 (1954); *Harper v. Commissioner*, 54 T.C. 1121, 1129 (1970). One indirect method of income reconstruction is a bank deposits analysis. We have long accepted bank deposits analysis as a reasonable reconstruction method. *See, e.g.*, *Nicholas v. Commissioner*, 70 T.C. 1057, 1064–65 (1978); *Harper*, 54 T.C. at 1129. Bank deposits, while not conclusive, are prima facie evidence of income. *Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986).

Normally, all money deposited into a taxpayer's account is presumed to be taxable unless the taxpayer can show otherwise. *Gowni v. Commissioner*, T.C. Memo. 2004-154, 87 T.C.M. (CCH) 1435, 1444 (first citing *DiLeo v. Commissioner*, 96 T.C. 858, 868 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992); and then citing *Price v. United States*, 335 F.2d 671, 677 (5th Cir. 1964)). However, in this case the Commissioner bears the burden of proof regarding the taxability of the deposits included in RA Bogdan's analysis (other than those already reflected in the notice of deficiency) because that analysis created an increased deficiency that was then asserted in the Commissioner's Amended Answer. *See* Rule 142(a)(1).

**[\*8]** Mr. Ottuso has not contested any specific items in RA Bogdan's analysis—whether in his Petition, at trial, or on brief—except for (1) those deposits that the Commissioner has already conceded are nontaxable and (2) a deposit of $34,200 into one of the bank accounts on September 2, 2014. Therefore, we hold that Mr. Ottuso has conceded $1,016,170 of taxable gross receipts (that is, $34,200 less than the Commissioner's figure after concessions). *See, e.g.*, Rule 34(b)(1)(G) ("Any issue not raised in the [petition's] assignments of error will be deemed conceded."). In any event, we are satisfied with the general reliability of RA Bogdan's bank deposits analysis. First, the Commissioner has already linked Mr. Ottuso with a substantial income-generating activity—namely, Pine Lake's business. *See Llorente v. Commissioner*, 649 F.2d at 156. Second, two of the three bank accounts that RA Bogdan analyzed were held in the name of Pine Lake. The deposits into the third account—held in Mr. Ottuso's own name—consist predominantly if not exclusively of credit card payments connected with Pine Lake sales and checks made out to Pine Lake. Third, RA Bogdan subtracted from her calculation of gross receipts the nontaxable deposits that she identified as such from the bank records. *Cf. Gowni*, 87 T.C.M. (CCH) at 1444 (stating that for purposes of a bank deposits analysis "the Commissioner must take into account any nontaxable items or deductible expenses of which the Commissioner has knowledge").

### B.    *September 2 Deposit and November 17 Deposit*

The records from one of Pine Lake's bank accounts show a deposit of $34,200 on September 2, 2014, but offer no description or breakdown of that amount. Nor do the bank records shed any light even indirectly on the source of the September 2 deposit.[11] At trial Mr. Ottuso originally contended that the deposit constituted a portion of the proceeds from the sale of his motorhome to Alpin Haus: the $50,000 value of the motorhome, minus the $15,118 value of the buggy, minus cash taken as an immediate withdrawal (purportedly $682). However, the bank records also include a copy of a canceled check from Alpin Haus for $34,882 dated November 12, 2014, and deposited (along with three other checks totaling $1,302) on November 17, 2014. This amount (i.e., $34,882) exactly matches the amount of cash shown as due from Alpin

---

[11] For instance, while the provided bank records contain copies of canceled checks deposited into the three bank accounts, they do not include copies of canceled checks with a deposit date of September 2. In fact, there are no copies of canceled checks with a deposit date between August 30 and September 7, inclusive. And there are no copies of canceled checks of any date with an amount equal or close to $34,200, other than a $34,882 check from Alpin Haus (described below).

**[\*9]** Haus to Mr. Ottuso on the October 22, 2014, receipt for Mr. Ottuso's exchange of his motorhome for the buggy.[12] Therefore, the September 2 deposit clearly did not consist of proceeds from the motorhome.

Confronted with these facts at trial, Mr. Ottuso surmised that the September 2 deposit derived from his personal sale (separate from Pine Lake's business) of a Chevrolet truck. Mr. Ottuso credibly testified that he sold both a motorhome and a Chevrolet truck during the year at issue; and, in fact, the Commissioner stipulated that Mr. Ottuso sold a Chevrolet truck that year and had no taxable gain on the sale. For the reasons set forth above and those that follow, we conclude that the September 2 deposit constituted proceeds from the sale of the Chevrolet truck (the gain from which would be offset by Mr. Ottuso's basis) and the November 17 deposit constituted proceeds from the sale of the motorhome. However, we need to explain a discrepancy between our conclusion and the parties' stipulations.

Before trial the parties stipulated that a November 17 deposit of $36,184 constituted a nontaxable return of capital from Mr. Ottuso's sale of a Chevrolet truck. However, it is apparent from the bank records that the November 17 deposit consisted of a $34,882 check from Alpin Haus for the motorhome and three other checks totaling $1,302: one from Fulton County, New York, for $254, and the other two from Pine Lake, for $775 and $273, respectively.

Rule 91(e) provides in relevant part:

> A stipulation will be treated, to the extent of its terms, as a conclusive admission by the parties to the stipulation, unless otherwise permitted by the Court or as agreed by those parties. The Court will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except that it may do so if justice requires.

We have held that we may disregard a stipulation if the evidence contrary to the stipulation is substantial or if the stipulation is clearly contrary to facts disclosed by the record. *Cal-Maine Foods, Inc. v. Commissioner*, 93 T.C. 181, 195 (1989) (first citing *Loftin & Woodard, Inc. v. United States*, 577 F.2d 1206, 1232 (5th Cir. 1978); and then citing *Jasionowski v. Commissioner*, 66 T.C. 312, 317–18 (1976)). Here, the parties' statements at trial make clear that the stipulation regarding

---

[12] $50,000 − $15,118 = $34,882.

**[\*10]** the November 17 deposit was the product of a mutual mistake of fact.

On the weight of the evidence, we conclude that the September 2 deposit ($34,200) relates to the sale of the Chevrolet truck and that most of the November 17 deposit ($34,882) relates to the sale of the motorhome, rather than vice versa. The parties seem to have mistaken the dates of the two sales. As we further explain below, neither sale resulted in any taxable gain, and their proceeds should not have been included by RA Bogdan in the calculation of Schedule C business gross receipts.

Again, Mr. Ottuso received the $34,882 Alpin Haus check as partial consideration for his motorhome, for which Alpin Haus provided total consideration of $50,000. At trial Mr. Ottuso testified that he originally bought the motorhome for around $70,000 and did not substantially use it for business. We found this testimony credible and take it to establish by a preponderance of the evidence that Mr. Ottuso is not liable for any capital gain or depreciation recapture on the sale of the motorhome. Therefore, we preserve the parties' stipulation to the extent of reducing RA Bogdan's calculation of gross receipts by $34,882, and we will not make any addition to Mr. Ottuso's gross income on account of the Alpin Haus check.[13] However, we do adjust the stipulation as it relates to the three smaller checks totaling $1,302 (from Fulton County and Pine Lake) because they were already excluded by RA Bogdan from her calculation of gross receipts. Without this adjustment, the exclusions from income would be double counted.

Since the Commissioner arrived at his final gross receipts figure of $1,050,370 in part by reducing RA Bogdan's gross receipts calculation by the entire November 17 deposit of $36,184, the Commissioner's figure must be increased by $1,302 (the sum of the three smaller checks) and then reduced by $34,200 (to account for the sale of the Chevrolet truck in September) to properly reflect gross receipts. With these adjustments, we determine that Pine Lake's total gross receipts for the year at issue are $1,017,472.

III. *Gasoline Deduction*

Section 162 generally allows a deduction for the ordinary and necessary expenses of carrying on a trade or business. Under section

---

[13] Because the motorhome was not used for business purposes, Mr. Ottuso does not qualify for any capital loss deduction. *See* I.R.C. § 165(c).

**[\*11]** 274(d) taxpayers must meet strict substantiation requirements to deduct certain expenses under section 162, including expenses for the use of "listed property" as defined in section 280F(d)(4), such as passenger automobiles. To meet these strict requirements with respect to listed property, taxpayers must substantiate by adequate records, or by sufficient evidence corroborating their own statements, (1) the amount of the expense, (2) the amount of total use and of business use of the listed property during the tax year, (3) the date of each expense or use of the listed property, and (4) the business purpose of each expense or use. *See* I.R.C. § 274(d); *Boyd v. Commissioner*, 122 T.C. 305, 320 (2004); Temp. Treas. Reg. § 1.274-5T(b)(6).[14]

To substantiate vehicle expenses by way of adequate records, taxpayers must maintain a contemporaneous log, trip sheet, or similar record, as well as corroborating documentary evidence, that together establish each of the four required elements listed above. *See Frost v. Commissioner*, 154 T.C. 23, 29 (2020); Temp. Treas. Reg. § 1.274-5T(c)(2)(i) and (ii). In the absence of adequate records, taxpayers may establish each required element by providing both "[their] own statement, whether written or oral, containing specific information in detail as to such element" and "other corroborative evidence sufficient to establish such element." Temp. Treas. Reg. § 1.274-5T(c)(3)(i); *see also Shea v. Commissioner*, 112 T.C. 183, 187 (1999). In applying these rules here, we note that they apply equally (with the exception noted below) to "any pickup truck or van, unless the truck or van has been specially modified with the result that it is not likely to be used more than a de minimis amount for personal purposes." Treas. Reg. § 1.274-5(k)(7); *see also Hoakison v. Commissioner*, T.C. Memo. 2022-117, at \*18.

The exception to the strict substantiation rules is for "qualified nonpersonal use vehicles" (QNUVs), i.e., vehicles which, by reason of their nature, are not likely to be used more than a de minimis amount for personal purposes. I.R.C. § 274(d) (flush language), (i). The class of QNUVs includes clearly marked emergency vehicles, vehicles designed to carry cargo with a loaded gross vehicle weight (GVW) over 14,000

---

[14] Section 7805(e)(2) provides that temporary regulations expire within three years after the date of issuance. However, that rule applies only to regulations issued after November 20, 1988. *See* Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, § 6232(b), 102 Stat. 3342, 3735. The provisions of Temporary Treasury Regulation § 1.274-5T referenced here were first issued in 1985, *see* T.D. 8061, 1985-2 C.B. 93, 100–09, and none of those provisions has since been amended.

**[\*12]** pounds, flatbed trucks, and farm equipment. *See* Treas. Reg. § 1.274-5(k)(2)(ii).

Mr. Ottuso did not offer any contemporaneous records of how the three Pine Lake vehicles—the box truck, the pickup truck, and the service van—were used during the year at issue. Nor did he provide any corroborative evidence to support his assertion that the vehicles were used exclusively for business purposes. Moreover, the record contains no detailed descriptions or photographs of the vehicles. In the absence of such evidence, we find that none of the three vehicles was a QNUV. *See* Treas. Reg. § 1.274-5(k)(7).[15] Notably, Mr. Ottuso presented no evidence that the 16-foot box truck—which he described as "like a U-Haul van"—was a flatbed truck or had a loaded GVW over 14,000 pounds. *See* Treas. Reg. § 1.274-5(k)(2)(ii)(C), (J). And even if it were, we do not have sufficient information in the record to estimate its portion of the total gasoline expense.

Therefore, we may not use the *Cohan* rule to estimate gasoline expenses for any of the Pine Lake vehicles. Their potential status as QNUVs is not supported by the weight of the evidence, nor are their individual gasoline expenditures so supported. *See Sanford*, 50 T.C. at 827–28. Since Mr. Ottuso did not satisfy the strict substantiation requirements of section 274(d) with respect to any of the vehicles (for instance, he did not provide a mileage log), he cannot deduct gasoline expenses above the $5,000 conceded by the Commissioner. As we remarked in a similar case:

> [W]hile we believe that [the taxpayer] had business travel expenses . . ., the Court must heed the strict substantiation requirements of section 274(d). . . . [The taxpayer] did not record the amount, the time, or the business purpose of each business use of his truck because, in his words, "it was

---

[15] Treasury Regulation § 1.274-5(k)(7) offers the following example to illustrate when a van or truck might be a QNUV:

> [A] van that has only a front bench for seating, in which permanent shelving that fills most of the cargo area has been installed, that constantly carries merchandise or equipment, and that has been specially painted with advertising or the company's name, is a vehicle not likely to be used more than a de minimis amount for personal purposes.

The exteriors of all three Pine Lake vehicles were lettered with the name "Pine Lake Stoves & Fireplaces." However, the record contains no further indication that any of the vehicles was modified so as to make personal use unlikely.

**[\*13]** just too much to do." Accordingly, his deduction must be disallowed.

*Garza v. Commissioner*, T.C. Memo. 2014-121, at \*6–7; *see also DeLima v. Commissioner*, T.C. Memo. 2012-291, at \*16 ("While we do not doubt that [the taxpayer] used one or more vehicles for business during 2005, we have no choice but to deny her any deduction for vehicle expenses in excess of the amount already allowed by respondent [in view of her failure to fully satisfy the section 274(d) requirements].").

IV.     *Section 179 Deductions*

Section 179(a) and (d) generally allows an accelerated current-year deduction for the entire cost of tangible property that is purchased during the year for use in the active conduct of a trade or business and that would otherwise be depreciable under section 167. The deduction of the property's entire cost is allowed regardless of when during the year the property was purchased. *See* Treas. Reg. § 1.179-1(c). If the taxpayer uses the property for his trade or business as well as for personal purposes during the year of purchase, the deduction is still allowed if the business use is greater than 50% of total use—but the deduction is then limited to the portion of the cost attributable to the business use only. *See* Treas. Reg. § 1.179-1(d). The taxpayer must elect the benefits of section 179 by indicating the election—and the specific items to which it applies—on his first income tax return (whether timely or untimely) for the year of the election, or on an amended return filed within the time prescribed by law (including extensions) for filing the original return for the year in question. I.R.C. § 179(c)(1); *Patton v. Commissioner*, 116 T.C. 206, 208 (2001); Treas. Reg. § 1.179-5(a).

Mr. Ottuso has claimed in this litigation that he qualifies for a section 179 deduction for the year at issue with respect to the mower, the tractor (and its associated financing fees), and the buggy.[16] The 2014 Form 1040 that he submitted to the Commissioner's counsel in July 2020 indicates a section 179 election for the mower and the tractor but not the buggy, so as an initial matter Mr. Ottuso cannot claim a section 179 deduction for the purchase price of the buggy. *See Kilpatrick v.*

---

[16] The Form 1040 that Mr. Ottuso submitted to the Commissioner's counsel in July 2020 indicates a section 179 election for a "Chevy Silverado 2015" truck in addition to the mower and the tractor. However, Mr. Ottuso has not met the strict substantiation requirements (described in more detail *supra* pp. 11–13) needed to show that he used the latter truck for business purposes, so we do not allow a section 179 deduction for any of its purported purchase price.

**[\*14]** *Commissioner*, T.C. Memo. 2016-166, at \*25–26 (disallowing a section 179 deduction to which the taxpayer claimed entitlement at trial but for which he had made no election on his return). As for the mower and the tractor, Mr. Ottuso submitted his 2014 Form 1040 nearly five years after the deadline, over two years after the Commissioner executed the SFR, and nearly two years after the notice of deficiency was issued. We have held before that "late-filed 1040s simply do not take precedence over . . . SFRs." *Rodriguez v. Commissioner*, T.C. Memo. 2009-22, 97 T.C.M. (CCH) 1090, 1092. Therefore, we will not allow Mr. Ottuso any of the benefits of section 179 for the year at issue. However, because Mr. Ottuso claimed entitlement to section 179 deductions for the mower, the tractor (and its financing fees), and the buggy, we will also deem him to have claimed, as an alternative, entitlement to a depreciation deduction with respect to each vehicle for the year at issue. *Cf.* Rule 31(d) ("A pleading must be construed so as to do justice."); *Gray v. Commissioner*, 138 T.C. 295, 298 (2012) ("All claims in a petition should be broadly construed so as to do substantial justice, and a petition filed by a pro se litigant should be liberally construed."). Whether Mr. Ottuso is entitled to such depreciation deductions is discussed below.

V.    *Depreciation*

Section 167(a) allows as a depreciation deduction a reasonable allowance for the "exhaustion, wear and tear" of property used in a trade or business. Where property is used for both business and personal purposes, the allowable deduction is measured by the percentage of business use. *See Noyce v. Commissioner*, 97 T.C. 670, 693 (1991); *Cartwright v. Commissioner*, T.C. Memo. 2015-212, at \*7–8. Section 274(d) imposes strict substantiation requirements (explained above) for any deduction—including a depreciation deduction—with respect to "listed property" as defined in section 280F(d)(4)(A), which includes "any passenger automobile" or "other property used as a means of transportation" and "any property of a type generally used for purposes of entertainment, recreation, or amusement."

Mr. Ottuso testified that in the year at issue he used the mower about 80% for Pine Lake's premises and 20% for his personal residence. Likewise, he testified that he used the tractor about 90% for Pine Lake's premises (mostly for snow removal, and sometimes to help offload third-party delivery vehicles) and 10% for his personal residence. Finally, he testified that he used the buggy almost exclusively for ferrying materials

**[\*15]** between the warehouse and the shop and that his personal use was only occasional.

### A.  *Mower and Tractor*

We generally found Mr. Ottuso to be a credible witness, and we find it more likely than not that the mower and the tractor were used more than 50% for Pine Lake's business. However, it was apparent from Mr. Ottuso's testimony that the business use percentage he offered for each piece of equipment was an estimate not based on any contemporaneous records. We do not find these estimates particularly reliable given that (1) they were made eight years after the fact and (2) Mr. Ottuso's personal residence was adjacent to Pine Lake's business premises, giving him an easy opportunity to use the equipment for personal chores. Pursuant to the *Cohan* rule, *see Cohan v. Commissioner*, 39 F.2d at 543–44,[17] we will "bear heavily" on Mr. Ottuso—who failed to keep any contemporaneous records—and allow him one-half year's depreciation, *see* I.R.C. § 168(d)(1), (4)(A), with respect to only 51% of his cost basis in the mower (i.e., 51% of $12,600 = $6,426) and only 51% of his cost basis in the tractor (i.e., 51% of $66,000 = $33,660).[18] Also, because his financing contract for the tractor had a term of four years (beginning April 24, 2014), we will allow him eight months plus seven days of straight-line depreciation (assuming a useful life of four years) for 51% of his basis in the filing fee, "documentary" fee, and property insurance fee (i.e., 51% of $3,363 = $1,715).[19]

### B.  *Buggy*

We must disallow any depreciation deduction with respect to the buggy, since it is "listed property" within the meaning of section 280F(d)(4) and Mr. Ottuso did not establish that it is a QNUV. Mr. Ottuso supplied neither contemporaneous records nor detailed corroborative evidence to support his assertion—which we otherwise

---

[17] We are not precluded by section 274(d) from using the *Cohan* rule to estimate Mr. Ottuso's business use of the mower and the tractor, since Treasury Regulation § 1.274-5(k)(2)(ii)(Q) designates as QNUVs "[t]ractors and other special purpose farm vehicles."

[18] We note that Mr. Ottuso's basis in the tractor includes the full purchase price despite his purchase's being partly loan financed. *See Commissioner v. Tufts*, 461 U.S. 300, 307 (1983) ("Because of the obligation to repay, the taxpayer is entitled to include the amount of the loan in computing his basis in the property . . . .").

[19] The parties may include in their Rule 155 computations their calculations of the appropriate deductions, pursuant to the principles of sections 167 and 168.

**[\*16]** found credible—that the buggy was used mostly for business purposes. *See* I.R.C. § 274(d).

C. *Other Depreciable Assets*

Before trial Mr. Ottuso provided to the Commissioner's counsel a draft 2014 Form 1040 with an attached Form 4562 which claims (among other items) $11,400 of depreciation for assets placed in service before 2014 and $4,998 of "other" depreciation[20] but gives no indication of which assets these amounts pertain to. One of Mr. Ottuso's trial witnesses was Carmen Gentile, an accountant who assisted Mr. Ottuso during the IRS's examination for his 2012, 2013, and 2014 tax years. Mr. Gentile explained that he prepared the Form 4562 in question and derived the figures of $11,400 and $4,998 by extrapolating from depreciation amounts claimed on Mr. Ottuso's 2012 and 2013 federal tax returns.[21] Mr. Gentile confirmed that he lacked any direct evidence of what the underlying assets were, when they were purchased, or what their purchase prices were. Mr. Ottuso did not offer any clarifications.

To deduct depreciation, a taxpayer must (among other things) "establish the property's depreciable basis, by showing the cost of the property, its useful life, and the previously allowable depreciation." *Cluck v. Commissioner*, 105 T.C. 324, 337 (1995). Mr. Ottuso has not presented evidence to establish the cost of, useful life of, or previously allowable depreciation on the property underlying the depreciation figures of $11,400 and $4,998. Mr. Ottuso had a duty to keep sufficient records containing that information. *See* I.R.C. § 6001; Treas. Reg. § 1.6001-1(a), (e). The 2012 and 2013 returns are not in evidence; and even if they were, we have remarked before that a taxpayer's returns from prior years generally do not hold any greater evidentiary weight than the taxpayer's current assertions. *Holden v. Commissioner*, T.C. Memo. 2015-131, at \*65 (citing *Wilkinson v. Commissioner*, 71 T.C. 633,

---

[20] Line 16 of the 2014 version of Form 4562 reads: "Other depreciation (including ACRS)." "ACRS" refers to the accelerated cost recovery system—generally applicable to property placed in service after 1980 and before 1987—which differs from the modified accelerated cost recovery system (MACRS) that applies to most property placed in service after 1986. *See* Tax Reform Act of 1986, Pub. L. No. 99-514, §§ 201–203, 100 Stat. 2085, 2121–46. The Instructions for the 2014 version of Form 4562 indicate that line 16 "other" depreciation also includes various further types of non-MACRS depreciation.

[21] Mr. Gentile explained that he tried but failed to secure detailed depreciation schedules from Mr. Ottuso's previous accountant. Mr. Ottuso's 2012 and 2013 returns are not in the record.

[*17] 639 (1979)).  We therefore disallow Mr. Ottuso's claims for "other" depreciation and for depreciation on pre-2014 assets.[22]

VI.  *Additions to Tax*

Section 6651(a)(1) imposes an addition to tax for the failure to file a return on or before the due date, unless the taxpayer can establish that his failure was "due to reasonable cause and not due to willful neglect."  Section 6651(a)(2) imposes an addition to tax for the failure to timely pay the amount shown as tax on a filed return.  If the Commissioner prepared an SFR on the taxpayer's behalf, the failure-to-pay addition is based on the amount shown as due on the SFR.  I.R.C. § 6651(g)(2).  However, the failure-to-file addition is based on the actual amount of tax finally determined, even if that exceeds the amount shown on the SFR.  *Id.* para. (1).

To demonstrate reasonable cause, a taxpayer must show that he exercised ordinary business care and prudence with respect to filing a return and paying his tax, respectively.  He must further show that he nevertheless was unable to file or pay on time or that timely payment would have posed an undue hardship.  *United States v. Boyle*, 469 U.S. 241, 246 (1985); Treas. Reg. § 301.6651-1(c)(1).  Here, the Commissioner satisfied his burden of production for the additions to tax by producing the SFR and the IRS account transcript for Mr. Ottuso's 2014 tax year. *See* I.R.C. § 7491(c); *Higbee* 116 T.C. at 446.  Mr. Ottuso therefore has the burden of proving that the reasonable cause exception applies. *Higbee*, 116 T.C. at 447.

The only evidence of reasonable cause that Mr. Ottuso presented was his recollection of advice from Robert Waite, the accountant who prepared certain of his tax returns for about 20 years up through 2013. According to Mr. Ottuso, the IRS was auditing his 2012 and 2013 tax

---

[22] Mr. Gentile testified that the Commissioner accepted Mr. Ottuso's 2012 and 2013 Forms 4562 during the audit for those years.  However, even assuming that Mr. Gentile's extrapolations to the year at issue are logically implied by the 2012 and 2013 depreciation information (which has not been shown), the Commissioner would not be bound in this proceeding to any concessions he made during the earlier audit.  *See Pekar v. Commissioner*, 113 T.C. 158, 166 (1999) ("[E]ach taxable year stands on its own and must be separately considered. [The Commissioner] is not bound in any given year to allow the same treatment permitted in a previous year." (Citation omitted.)); *Tanzi v. Commissioner*, T.C. Memo. 2016-148, at *9–10 (rejecting the taxpayers' contention that, because the Commissioner had allowed certain depreciation deductions for previous years, they were entitled to similar deductions for the year before us).

**[\*18]** returns as the deadline for his 2014 return approached. Mr. Ottuso testified that Mr. Waite "said there's no sense in filing tax returns when you're going through an audit." However, Mr. Waite himself testified that he never told Mr. Ottuso (nor any other client) to file a return past its due date.

We have held that in certain situations a taxpayer may reasonably rely on the advice of a legal or tax expert regarding the due date for a return or whether a return is due at all, even if the advice turns out to be wrong. *See, e.g.*, *Estate of La Meres v. Commissioner*, 98 T.C. 294, 324 (1992); *Estate of Paxton v. Commissioner*, 86 T.C. 785, 820 (1986). However, in view of the conflicting testimony of Mr. Ottuso and Mr. Waite here, Mr. Ottuso has not shown by a preponderance of the evidence that Mr. Waite advised him to delay filing his 2014 tax return. Thus, we hold Mr. Ottuso liable under section 6651(a)(1) and (2).[23]

We have considered all the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[23] The failure-to-file addition to tax is to be based on the total amount of tax as determined in this Opinion. The failure-to-pay addition to tax is to be based on the amount of tax shown on the SFR prepared by the Commissioner. Both additions are to be reduced as provided in section 6651(b)(1) and (2) and (c)(1), as applicable.